**Docket No. 19-35852**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

MOI MICHAEL, an individual,

*Plaintiff-Appellant,*

v.

CHIHULY STUDIO, INC., a Washington corporation,
DALE CHIHULY, individually and as a married person and
LESLIE CHIHULY, individually and as a married person,

*Defendants-Appellees.*

*Appeal from a Decision of the United States District Court for the Western District of Washington,
No. 2:17-cv-00853-RSL · Honorable Robert S. Lasnik*

# APPELLANT'S OPENING
# BRIEF [REDACTED]

LINCOLN C. BEAUREGARD, ESQ.
CONNELLY LAW OFFICES, PLLC
2301 North 30th Street
Tacoma, Washington 98403
(253) 593-5100 Telephone
(253) 593-0380 Facsimile

PHILIP A. TALMADGE, ESQ.
GARY W. MANCA, ESQ.
TALMADGE/FITZPATRICK
2775 Harbor Avenue SW
Suite C, Third Floor
Seattle, California 98126
(206) 574-6661 Telephone
(206) 575-1397 Facsimile

*Attorneys for Appellant Moi Michael*

 COUNSEL PRESS · (213) 680-2300                    PRINTED ON RECYCLED PAPER 

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

A. STATEMENT OF JURISDICTION ....................................1

B. INTRODUCTION ...............................................................1

C. ISSUES PRESENTED FOR REVIEW .............................2

D. STATEMENT OF FACTS AND PROCEDURE ...........3

    (1) Factual History ........................................................3

        (a) Dale Chihuly Uses Other People to Create Paintings and Thinks Signing an Artwork Suffices to Make It His .................3

        (b) Michael Moi Created Chihuly's *Pumpkin* Series of Paintings and Contributed to Other Paintings Signed by Chihuly ...................................4

        (c) Chihuly Broke His Promise to Moi to Compensate Moi Financially for Moi's Contributions to the Painted Works ......11

    (2) Procedural History ................................................12

E. SUMMARY OF ARGUMENT ......................................14

F. ARGUMENT ...................................................................17

    (1) Standard of Review on Summary Judgment ......17

    (2) Whether Moi Had a Joint Authorship Claim Under the Copyright Act Was for the Jury ..........................18

        (a) The Copyright Act Provides Tools for People with Unique Ideas and Methods to Solely Own the Copyright in a Work They Do Not Make Alone, but Chihuly Utilized None of Them ..........................19

i

(b) Whether Joint Contributors to a Work Are Joint "Authors" Under the Copyright Act Is a Fact-Intensive Jury Question with Flexible Guidelines, Not a Rigid Statutory Formula ........................................................2

(c) The Jury, Not the District Court, Should Have Decided Whether Moi's Artistic Contributions Rose to the Level of Co-Authorship ........................................................24

  (i) The Statutory Text—"Inseparable" Contributions.........24

  (ii) The "Control" Factor ........................................................27

  (iii) The "Intent" Factor ........................................................31

  (iv) The "Audience Appeal" Factor ........................................33

(d) Moi's Claims Under the VARA Should Be Remanded for Trial ........................................................34

(3) Moi's Copyright Claims Are Not Limited to Those Produced After February 21, 2014 ........................................................34

(4) Chihuly's Confidential Settlement Agreements with ██████ ██████ Were Discoverable ........................................................37

(5) Chihuly Was Estopped to Deny His Agreement with Moi.................42

(6) The District Court Abused Its Discretion in Imposing a Fee Award in Excess of $1.6 Million Against Moi ........................................................46

(a) The District Court Should Not Have Awarded Fees ...............47

(b) The Fee Award Was Excessive in a Case Resolved on Summary Judgment ........................................................51

G.    CONCLUSION...............................................................................54

CERTIFICATE OF COMPLIANCE.........................................................55

STATEMENT OF RELATED CASES.....................................................56

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Aalmuhammed v. Lee*,
  202 F.3d 1227 (9th Cir. 2000) ...............................................................*passim*

*Adair v. City of Kirkland*,
  185 F.3d 1055 (9th Cir. 1999) .......................................................................17

*Aguilar v. Intl Longshoremen's Union Local No. 10*,
  966 F.2d 443 (9th Cir. 1992) ...................................................................44, 45

*Armento v. Laser Image, Inc.*,
  950 F. Supp. 719, (W.D.N.C. 1996), *aff'd*,
  134 F.3d 362 (4th Cir. 1998) .......................................................................21

*Athey v. Farmers Ins. Exch.*,
  234 F.3d 357 (8th Cir. 2000) .......................................................................42

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
  966 F.2d 470 (9th Cir.1992) .......................................................................41

*Berman v. Johnson*,
  518 F. Supp. 2d 791 (E.D. Va. 2007), *aff'd*,
  315 Fed. Appx. 461 (4th Cir. 2009) .............................................................30

*Big Baboon Corp. v. Dell, Inc.*,
  2010 WL 3955831 (C.D. Cal. Oct. 8, 2010) ................................................40

*Blankenship v. Hearst Corp.*,
  519 F.2d 418 (9th Cir. 1975) .......................................................................39

*Bleistein v. Donaldson Lithographing Co.*,
  188 U.S. 239 (1903)......................................................................................24

*Blum v. Stenson*,
  465 U.S. 886 (1984)......................................................................................51

*Carter v. Caleb Brett, LLC*,
    757 F.3d 866 (9th Cir. 2014) ..........................................................................51

*Cheffins v. Stewart*,
    825 F.3d 588 (9th Cir. 2016) ..........................................................................15

*Childress v. Taylor*,
    945 F.2d 500 (2d Cir. 1991) ...............................................................2, 23, 29

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)..................................................................................20, 21

*Coutin v. Young & Rubicam Puerto Rico, Inc.*,
    124 F.3d 331 (1st Cir. 1997)...........................................................................51

*Del Madera Properties v. Rhodes & Gardner, Inc.,*
    820 F.2d 973 (9th Cir. 1987) ..........................................................................19

*Direct Techs., LLC v. Elec. Arts, Inc.,*
    836 F.3d 1059 (9th Cir. 2016) ..................................................................22, 24

*Dumas v. Gommerman*,
    865 F.2d 1093 (9th Cir. 1989), *rejected on other grounds by*
    *Reid,* 490 U.S. 730 (1989) .......................................................................30, 43

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co., Inc.,*
    140 F.2d 266 (2nd Cir. 1944), *modified by,*
    140 F.2d 268 (1944) ..................................................................................22, 28

*Erickson v. Trinity Theatre, Inc.*,
    13 F.3d 1061 (7th Cir. 1994) ....................................................................19, 22

*Ets–Hokin v. Skyy Spirits, Inc.*,
    323 F.3d 763 (9th Cir. 2003) ..........................................................................47

*Everly v. Everly*,
    958 F.3d 442 (6th Cir. 2020) ...........................................................34, 35, 36

*Fogerty v. Fantasy, Inc.,*
    510 U.S. 517 (1994)..................................................................................35, 46

*Fun Spot of Florida, Inc. v. Magical Midway of Cent. Florida, Ltd.*,
    242 F. Supp. 2d 1183 (M.D. Fla. 2002) ......................................................24

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*,
    332 F.3d 976 (6th Cir. 2003) .........................................................................39

*Hall v. Swift*,
    782 Fed. Appx. 639 (9th Cir. 2019) ......................................................24, 26

*Hallett v. Morgan*,
    296 F.3d 732 (9th Cir. 2002) .........................................................................41

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985)................................................................................19, 29

*Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*,
    2015 WL 164069 (D. Conn. Jan. 13, 2015) .................................................38

*Havens v. C & D Plastics, Inc.*,
    124 Wash.2d 158 (1994) ...............................................................................43

*Heaton v. Imus*,
    93 Wash.2d 249 (1980) .................................................................................44

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)................................................................................52, 53

*Hough v. Stockbridge*,
    150 Wash.2d 234 (2003) ...............................................................................46

*Howard v. Fitzgerald*,
    58 Wash.2d 403 (1961) .................................................................................44

*In re Enron Corp. Secs., Derivative & Erisa Litig.*,
    623 F. Supp. 2d 798 (S.D. Tex. 2009)....................................................38, 41

*Ingenco Holdings, LLC v. Ace Am. Ins. Co.*,
    921 F.3d 803 (9th Cir. 2019) ...........................................................18, 26, 31

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
　　426 F.3d 694 (3d Cir. 2005) .................................................................51, 52

*Jackson v. Axton*,
　　25 F.3d 884 (9th Cir. 1994) ...........................................................................47

*Kalinauskas v. Wong*,
　　151 F.R.D. 363 (D. Nev. 1993) ......................................................................39

*Kerr v. Screen Actors Guild, Inc.*,
　　526 F.2d 67 (9th Cir. 1976), *cert. denied,*
　　425 U.S. 951 (1976)........................................................................................52

*Klinke v. Famous Recipe Fried Chicken, Inc.*,
　　94 Wash.2d 255 (1980) ..................................................................................42

*Lectus, Inc. v. Rainier National Bank*,
　　97 Wash.2d 584 (1982) ..................................................................................44

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*,
　　903 F.2d 1486 (11th Cir. 1990) ................................................................25, 26

*Mass. Museum of Contemporary Art Found., Inc. v. Buchel*,
　　593 F.3d 38 (1st Cir. 2010)............................................................................27

*McCown v. City of Fontana*,
　　565 F.3d 1097 (9th Cir. 2009) .......................................................................51

*Missouri v. Jenkins*,
　　491 U.S. 274 (1989).......................................................................................53

*Morrison v. Philadelphia Hous. Auth.*,
　　203 F.R.D. 195 (E.D. Pa. 2001) ....................................................................39

*Perfect 10, Inc. v. Giganews, Inc.*,
　　847 F.3d 657 (9th Cir. 2017), *cert. denied,*
　　138 S. Ct. 504 (2017)......................................................................................47

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,
　　307 F.3d 1206 (9th Cir. 2002) .......................................................................37

*Phillips v. Gen. Motors*,
    307 F.3d 1206 (9th Cir. 2002) .........................................................41

*Reza v. Pearce*,
    806 F.3d 497 (9th Cir. 2015) ...........................................................37

*Rhoades v. Avon Products, Inc.,*
    504 F.3d 1151 (9th Cir. 2007) ...................................................39, 40

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
    531 F.3d 962 (9th Cir. 2008), *cert. denied,*
    555 U.S. 1137 (2009).......................................................................23

*Ryan v. Editions Ltd. W., Inc.*,
    786 F.3d 754 (9th Cir. 2015) ...........................................................51

*Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*,
    119 F.3d 55 (1st Cir. 1997)..............................................................35

*Smith v. Mitchell*,
    453 F.3d 1203 (9th Cir. 2006) .............................................18, 26, 31

*State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic &*
    *Rehab Clinic, P.C.*,
    315 F.R.D. 220 (E.D. Mich. 2016) ..................................................38

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) .....................................................17, 18

*Thomson v. Larson*,
    147 F.3d 195 (2d Cir. 1998) ......................................................19, 22

*T-Peg, Inc. v. Vermont Timber Works, Inc.*,
    669 F.3d 59 (1st Cir. 2012)..............................................................51

*United Oil Co., Inc. v. Parts Assocs., Inc.*,
    227 F.R.D. 404 (D. Md. 2005) ........................................................39

*United States v. Abel*,
  469 U.S. 45 (1984)........................................................................50

*Zuill v. Shanahan*,
  80 F.3d 1366 (9th Cir. 1996), *cert. denied,*
  519 U.S. 1090 (1997)...............................................................34, 35

## COURT RULES

Federal Rules of Civil Procedure 26.................................................38

Federal Rules of Civil Procedure 26(b)(1) ...............................16, 37, 42

Federal Rules of Civil Procedure 26(c) ...............................13, 16, 40, 41

Federal Rules of Civil Procedure 26(c)(1)........................................40

Federal Rules of Civil Procedure 56(a) ...........................................17

Federal Rules of Evidence 408 .................................................39, 40, 41

Federal Rules of Evidence 408(a)..................................................40

Federal Rules of Evidence 408(b)..................................................40

## STATUTES

17 U.S.C. § 101 ...............................................................*passim*

17 U.S.C. § 102(b) ........................................................20, 29

17 U.S.C. § 106...............................................................19, 36

17 U.S.C. § 106A...............................................................1, 34

17 U.S.C. § 201...............................................................32

17 U.S.C. § 201(a) ...........................................................18

17 U.S.C. § 201(b) ..................................................................21, 29, 30

17 U.S.C. § 201(d) ...........................................................................21

17 U.S.C. § 505 ..........................................................3, 14, 16, 46, 47, 51

17 U.S.C. § 507(b) ...........................................................................34

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

## OTHER AUTHORITIES

1 *Nimmer on Copyright* § 6.03 (2012 Update) .......................................29

Chihuly Drawings, https://www.chihuly.com/shop/chihuly-drawings
    (lasted accessed June 28, 2020) ...................................................10

H.R. Rep. 94-1476, 1976 U.S.C.C.A.N. 5659 ....................................32, 43

Jen Graves, *Glass Houses*, *The Stranger* (Feb. 16, 2006),
    https://www.thestranger.com/seattle/glass-houses/
    Content?oid=30734 .......................................................................49

Kathaleen Roberts, *The Glass Master Returns to Santa Fe*,
    Albuquerque *Journal* (Sep. 21, 2013), https://www.abqjournal.com
    /267112/glass-master-returns-to-sf.html ........................................49

Regina Hackett, *Chihuly Victimized by His Own Success?*
    *Despite Depression, Legal Woes, Renowned Artist Still Turns Out the*
    *Work*, Seattle *Post Intelligencer* (Apr. 16, 2006),
    https://www.seattlepi.com/ae/article/Chihuly-victimized-by-his
    -own-success-1201229.php (last accessed June 27, 2020)....................49

Sheila Farr & Susan Kelleher, *Inside the Glass Empire*, Seattle
    *Times* (Apr. 29, 2010), https://special.seattletimes.com
    /o/html/chihulyinc/2003178395_chihuly06.html
    (last accessed June 28, 2020)..........................................................................49

Timothy Egan, *Glass Artists Face Off in Court*, New York *Times*
    (June 1, 2006), https://www.nytimes.com/2006/06/01/us/
    glass-artists-face-off-in-court.html (last accessed June 28, 2020) ...............49

## A.     STATEMENT OF JURISDICTION

This appeal is from a final judgment on claims under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 106A, and state law of quasi-contracts. The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## B.     INTRODUCTION

Artist Dale Chihuly worked with other artists to create paintings but then claimed the artworks as his alone. He even signed his name on some paintings without having otherwise touched them. While relying on these contributors to churn out thousands of paintings that he then sold for millions of dollars, Chihuly once promised to "take care of" his collaborators financially. But then he froze out Michael Moi and induced others to sign confidential settlement agreements. Chihuly has not acknowledged Moi's expressive contributions, shared revenues with him, or even paid him for his time.

On appeal, Moi does not ask that his copyright and quasi-contract claims be decided as a matter of law. Rather, this appeal is simply about whether a jury may reasonably find for the Moi, viewing the record and reasonable inferences are viewed in the light most favorable to Moi. Under the Copyright Act, a "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. §

1

101. This standard may be satisfied even if one of the artists was the dominant author of the team's artwork and the other artist played a lesser role. *Childress v. Taylor*, 945 F.2d 500, 507–08 (2d Cir. 1991). While Chihuly may have been *an* author of the disputed paintings, perhaps even the dominant author, the district court took the joint authorship question from the jury on summary judgment. The court erred. Moi adduced the testimony of two experts who substantiated his claim that he was a joint author, and this Court has cautioned that judges should not sit in judgment of the artistic standards articulated by Congress in the Copyright Act. Those are jury questions.

The district court erred also in holding that the three-year statute of limitations under the Act barred claims for works created before early 2014; dismissing Moi's promissory estoppel claim; entering a protective order prohibiting Moi from discovering Chihuly's confidential settlement agreements with other artists; and awarding $1.6 million in attorney fees to Chihuly. Its judgment should be reversed.

## C.    ISSUES PRESENTED FOR REVIEW

(1)    Under the Copyright Act, was there a genuine issue of material fact on Moi's claims of joint authorship under the Copyright Act, and for having an otherwise copyrightable interest in the artworks as issue, where Moi adduced substantial evidence of his contributions to the artworks?

(2)     Did the Act's statute of limitations bar Moi's claims for damages for artworks created before February 17, 2014?

(3)     Did the district court err in prohibiting Moi from discovering evidence of Chihuly's secret agreements settling other contributors' copyright claims?

(4)     Under Washington law, was there a genuine issue for a jury trial on Moi's claim of promissory estoppel where Moi adduced evidence of Chihuly's promises to him?

(5)     Did the district court erred in its award of attorney fees to Chihuly under 17 U.S.C. § 505 where Moi's claims were far from frivolous?

## D.     STATEMENT OF FACTS AND PROCEDURE

### (1)     Factual History

#### (a)     Dale Chihuly Uses Other People to Create Paintings and Thinks Signing an Artwork Suffices to Make It His

As Chihuly has now admitted, many people have contributed to the paintings that bear Chihuly's signature alone. ER 1248, 1469, 1472. Among the contributors are Piper O'Neill, Billy O'Neill, and Damien Villareal. ER 1199. Not all were Chihuly's employees or paid at the time. ER 1463, 1467. Still, he promised to "take care of" them "financially," hoping they would continue working with him. ER 1053-55, 1467. Chihuly was absent from many work sessions due to his health. ER 1046, 1199, 1248, 1410, 1440-41, 1472. But these contributors "kept very quiet" about their work because there were "certain expectations," according to Piper

3

O'Neill. ER 1465-66. This clandestine operation led to Chihuly's company accumulating 7,600 painted works between 1999 and 2014, when Moi was active. ER 1201. Of those, 497 works were lost or discarded. ER 1201. The other thousands were sold, exhibited, loaned, or gifted, or remain inventoried for sale or other use. *Id.* Their total appraised value was between $147.8 million and $206.9 million. ER 1573. Chihuly presented these paintings to the public as "produced exclusively" by him. ER 1472.

Chihuly compares himself to Michelangelo, whose assistants helped paint the Sistine Chapel. ER 1199, 1472. In Chihuly's case, other artists chose the colors and painted the backgrounds and basic design elements, and even final touches were sometimes applied by other artists. ER 1076, 1079-80, 1199, 1410, 1472. Chihuly signed and marketed some paintings that "he had nothing to do with," as he acknowledged and as some contributors confirmed. ER 1076, 1410, 1465, 1470. But Chihuly said that he contributed his "style." ER 1470. Chihuly believed that "the ownership of a piece of art is owned by the person that signs it," but sometimes an employee signed Chihuly's name. ER 1081, 1471.

### (b) Michael Moi Created Chihuly's *Pumpkin* Series of Paintings and Contributed to Other Paintings Signed by Chihuly

Michael Moi contributed to paintings made in Chihuly's studio. ER 1462-63, 1563, 1568. According to expert Erin L. Thompson, Ph.D, a law professor who has a doctorate in art history and specializes in art law, Moi's work was "synonymous

with the original and tangible artistic expressions that would reasonably lead an individual in the art industry to be identified as potentially the primary author." ER 1563. Dr. Thompson also explained, "the nature of Moi and Chihuly's working relationship for the creation of paintings and drawings would—and should—create an expectation of co-ownership." ER 1563. While Moi was not the sole author, Dr. Thompson concluded that his contributions were "codependent parts of the artwork's creation that were combined into a single product." ER 1564. Rejecting the notion that Moi's contributions were controlled by Chihuly, Dr. Thompson concluded that "Moi's contributions were contributions that he controlled and result in what the artistic community would consider fixed, creative expressions to the works." ER 1564. Dr. Thompson continued, "In the art industry, these contributions would be considered substantial and the product of an independent, creative mind." ER 1564.

Moi first met Chihuly in late 1999 through Billy O'Neill, who knew Moi and worked for Chihuly's company. ER 1249, 1409. At the time, Chihuly "wanted to create a large portfolio of paintings." ER 1410. Soon after meeting Chihuly, Moi "began receiving invitations to participate in weekend and evening painting sessions." ER 1409. Moi worked on paintings from time to time until 2014. ER 1105-06, 1250. Moi started out "just doing a little," he recalls, "and then I started doing a whole lot more and just progressed from there." ER 1057, 1105. Moi worked without

a written agreement. ER 1059, 1063, 1097. Moi "trusted and believed in" Chihuly, says Moi. ER 1071. Moi stopped painting at Chihuly's studio after Chihuly fired Billy O'Neill in 2014. ER 1072.

Moi personally conceptualized and created the *Pumpkin* series of paintings, which Chihuly signed and marketed as his own:



Images of the "Pumpkin" series used on Chihuly's Facebook page for posts in 2013, 2014, and 2015.

Images of the "Pumpkin" series used on Chihuly's Facebook page for posts in 2013, 2014, and 2015.

ER 1046, 1410-11, 1578.

Moi also worked on the *Burn* series of paintings marketed by Chihuly's company. ER 1083-84, 1462. In these works, the paint contained pieces of charcoal and "interference" (pearlized) pigments. ER 1463. A blow torch was then used to burn the surface of the paintings, giving them "a very different characteristic." ER 1083-84, 1462. The series was first started in 2007 and then took two years to complete. ER 1462, 1467. Chihuly does not claim that he himself created the *Burn*

series, as he does not remember its genesis, and Chihuly acknowledged that other people contributed to *Burn* paintings. ER 1470-71.

"Michael was invited to burn the drawings," recalled Piper O'Neill. ER 1218; *see also,* ER 1114. Moi "was good at it," she says. ER 1463. While other artists contributed, Moi "burned a lot of those works." ER 1465. O'Neill stated that Moi even taught her how to use the blow torch, ER 1466, and Chihuly admits that the burns were an "artistic expression," ER 1470-71. During the two years that these artists created the *Burn* series, they generally worked every weekend. ER 1467. Piper O'Neill stated, "it was a big time commitment." ER 1467.

Moi also painted canvas paintings, backgrounds for other *Burn* series paintings and other works, and the plexiglass series. ER 1045, 1098, 1463, 1578. Moi recalled that he, Chihuly, and the other contributors "were doing [the paintings] together," and were like "co-workers." ER 1097. When Chihuly was present, Moi painted background colors, ER 1078, and Chihuly and Billy O'Neill then applied "dots, drips, and lines," as well "abstract forms," ER 1410. Finally, Chihuly or Billy O'Neill signed Chihuly's name. ER 1081, 1410. Chihuly did not expressly acknowledge Moi as a "co-creator," but "I knew I was," stated Moi, because "[t]here were times he wasn't even there at all." ER 1097-98. Moi especially remembers contributing to the creation of works on plexiglass and "quads" without Chihuly's

presence, particularly during four or five sessions in 2014 as Chihuly's health declined. ER 1099, 1106.

Moi recalls that "in the beginning," he "primarily" followed Chihuly's techniques and preferences. ER 1102. Over time, his contributions grew, and Moi himself began painting features such as "dots" and "circles," as well as abstract forms. ER 1028-29, 1075, 1078, 1110-11. While Chihuly would develop ideas and concepts, "the colors and the actual creation is different for each person," Moi has said, and Moi was never "simply copying other art work." ER 1111, 1411. Instead, he "was engaged in artistic expression using my own judgment as it related to my role." ER 1411. Moi's recollection was confirmed by Piper O'Neill. She said that the paintings did not follow "a formula per se," and described each "work" as "unique." ER 1464. And by 2014, when Moi worked on the plexiglass paintings, he said that "it was just Billy and I," and so they "just did what we did." ER 1102. "We just picked out colors and we did it." ER 1103. Moi also contributed to the *Jerusalem* series and the *Baskets*, *Floats*, and *Reeds* series. ER 1017, 1075, 1083, 1110, 1115, 1148.

Moi has identified 286 paintings that he co-authored. ER 499-590, 1018-27, 1082, 1331, 1413, 1568. To identify these paintings, Moi reviewed 6,159 small images furnished by Chihuly from database. ER 496, 1181, 1413. Moi did not claim he was 100% certain, and he acknowledged he "might be off on a painting or two."

ER 1082, 1087, 1167, 1414. And Moi later changed his mind about one of the 286 identified paintings, leaving 285. ER 992-93. But he said he "was pretty certain … because I, I know what type of paintings I did." ER 1082. For instance, when he assessed the *Burn* paintings, he knew based on the burn marks (his style was to make darker burns) that it was "more than likely" that he created the burns. ER 1087, 1463. Moi explained that he could identify his co-authored works with more precision if Chihuly provided larger images of the paintings, the dates of their creation, and Chihuly's and Billy O'Neill's calendars. ER 496, 1095-97, 1414. Without dates, he acknowledged that he could not be 100% certain. ER 1093-96. Even so, Moi confirmed it was "more likely than not" that he contributed to the 285 identified paintings, to "a reasonable degree of certainty." ER 496, 1414. Their total appraised value was between $6.9 million and $9.6 million. ER 1575.

Experts Dr. Thompson and Barbara Blades-Lines, ISA-AM, concluded that Moi was a joint author of the 285 paintings that he identified. Dr. Thompson stated that "at a minimum" Moi was "the joint author." ER 1563. Dr. Thompson continued, "Moi's contributions were of the nature in the artistic community are considered inseparable, symbiotic, and codependent parts of the artwork's creation that were combined into a single final product." ER 1564. Blades-Lines, who has experience appraising works created in a studio setting with contested authorship, concluded that "Mr. Moi's working relationship with Mr. Chihuly warrants recognition as a co-

author, author and also as an innovator for select drawings/paintings and series of artworks." ER 1570. She continued, "From the material I have read, Mr. Moi's artistic ideas and creative style were encouraged and served as an integral part of the quantity but also the diversity and quality of artwork signed 'Chihuly.'" ER 1570.

Chihuly's co-creators' contributions were also lauded in the book *Chihuly Drawings*. In discussing the *Basket* series, for example, the book praises the "dramatic black and dark blue backgrounds." ER 1237. Discussing the *Burn* series, the book extolls the "smoky smudges" as an innovation that "expands drawing's province." ER 1237. The book also noted the *Burn* series' backgrounds, describing their coloring as "[s]omber." ER 1237. The book is Chihuly-approved, as it was published by the Chihuly-owned Portland Press, and is sold through his website.[1]

Like other contributors, Moi also did other jobs around Chihuly's studio and had outside employment. Kate Elliott, the former assistant and Chihuly's retained expert in this case, was an administrator. ER 1559. Billy O'Neill skippered Chihuly's boat and had "various job responsibilities." ER 1307, 1409. Moi did construction work at the studio and on Chihuly's houses, and he also ran his own contractor business. ER 1039-41, 1201. Piper O'Neill was self-employed. ER 1462.

---

[1] *Chihuly Drawings*, https://www.chihuly.com/shop/chihuly-drawings (lasted accessed June 28, 2020).

Chihuly's arrangement with Moi—and other contributors—was "a secret deal." ER 1075, 1465-66. Chihuly told Moi, "This cannot go anywhere outside of where we are at here, painting." ER 1049. Under this shroud of silence, Chihuly selected which artworks to market and which to instead destroy or keep in storage. ER 1081.

### (c) Chihuly Broke His Promise to Moi to Compensate Moi Financially for Moi's Contributions to the Painted Works

Chihuly assured Moi that he "would be taken care of," just as Chihuly had promised to Piper O'Neill. ER 1044, 1467. When Piper O'Neill began painting with Chihuly, he asked her to keep returning. ER 1467. "I had an understanding why I was there," she recalls. *Id.* Chihuly assured Moi that the company was keeping "a record." ER 1045, 1049. Moi received these assurances, he says, "when I was first called in to come help," although he was not sure which date exactly. ER 1045, 1050-52. At first, Moi "thought it was kind of fun" ER 1045. But "as I was being called in more and more to help, and I was kind of going, Well, when am I going to get paid?" ER 1045. Chihuly and Moi did not discuss specific amounts, but Chihuly made clear his intention was to take care of Moi "financially" ER 1054-55. Moi understood Chihuly's promise as "binding," and Moi had in return pledged to "keep painting and helping and I would get paid later." ER 1056. According to Dr. Thompson, "the communications between Moi and Chihuly were communications

11

that were of a nature that – in the artistic community – would be considered a reasonable belief and agreement of joint authorship, at a minimum." ER 1564.

"For years," Moi stated, "I believed that Mr. Chihuly would make good on his promises." He did not realize that Chihuly "was repudiating my ownership in the art work that I created until December 24, 2016," when he spoke with Victor Humeniuk, a Chihuly associate. ER 1412. Humeniuk told Moi that Chihuly disputed the ownership rights of the O'Neills and Villareal. ER 1412. Alarmed, Moi's attorney then wrote a letter demanding significant compensation, ER 1442-56, which Chihuly refused. Chihuly signed a tolling agreement with Moi, effective February 21, 2017. ER 991, 997-1000.

**(2)   Procedural History**

Chihuly accepted service of an unfiled complaint from Moi and then filed it in King County Superior Court. ER 318, 991, 1350. Moi claimed joint authorship under the Copyright Act and VARA, as well as promissory estoppel. ER 1305-23. The defendants removed the action to the United States District Court for the Western District of Washington and then answered and counterclaimed. ER 1325-58. Chihuly later voluntarily obtained dismissal of his counterclaims. ER 9-10.

During discovery, Chihuly objected to Moi's requests for the confidential settlement agreements between him and ███████████████, and also directed ████████ not to answer deposition questions about ██. Dkt. #85 at 3-4, 22.

Chihuly then moved for a protective order prohibiting Moi from discovering information about these confidential settlement agreements. Dkt. #84 at 4-8. The district court granted the motion. ER 388.1. In a single sentence explaining its decision, the court did not find "good cause" pursuant to FRCP 26(c), but stated the "settlement agreements are both irrelevant and inadmissible." ER 388.1.

Chihuly filed a motion for summary judgment, ER 469-85, 1239-69, which Moi resisted, ER 1416-39. Chihuly argued that (1) Moi could not sufficiently identify his contributions to any of the works, ER 1254-57; (2) Moi was not a joint author under the Copyright Act, ER 1257-61; (3) the statute of limitations barred claims for any works created before February 21, 2014, ER 1261-64; (4) Moi was not an author within the meaning of the VARA, ER 1264; and (5) Moi could not establish promissory estoppel, ER 1264-69. Chihuly did not make an evidentiary objection to the expert opinions of Blades-Lines and Dr. Thompson. ER 469-85, 1239-69.

The district court granted summary judgment to Chihuly without mentioning Moi's experts. ER 11-22. The court found that Moi was not a joint author as a matter of law. ER 15-18. In so holding, the court cited three factors "to be weighed when determining a claim of co-authorship under § 101." ER 15 (citing *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000)). The court stated that the first factor ("control") "strongly favors Chihuly," and concluded that the record failed to create

a genuine issue for trial on the second factor ("mutual intent to be co-authors"). ER 16-17. But the court found that "an issue of fact" on the third factor (the source of the "audience appeal"). ER 18. Still, the court "weigh[ed]" the three factors and decided that "[t]he most important factor—which party superintended the creation of the work and possessed control over the final product—strongly favored Chihuly." ER 18. Despite finding a triable issue on one factor, the court dismissed Moi's claim "as a matter of law." ER 18. The court also found that Chihuly's assurances of compensation to Moi were "too vague to be enforceable" under promissory estoppel principles. ER 20. Finally, the court held that the statute of limitations barred Moi's copyright claims for works created before February 21, 2014. ER 21-22.

In a motion for attorney fees, Chihuly claimed 3,557.3 hours spent by a 12-person legal team. ER 242. The court awarded Chihuly $1.6 million in attorney fees under § 505 of the Copyright Act. ER 2-7. Moi timely appealed. ER 23-32.

## E.    SUMMARY OF ARGUMENT

Under the Copyright Act, joint authorship is a jury question, particularly when there is no written contract. Given the evidence in the record here, Moi's joint authorship claims should have been resolved by a jury. While Chihuly champions his artistic ideas and direction as dispositive proof of sole authorship, the Copyright Act does not protect ideas, methods, or mere direction. The Act protects tangible

14

expressions in works. Chihuly did not take advantage of any legal tool under the Act to establish sole authorship over a work made with one or more other artists—first, establishing an employment relationship; second, entering a work for hire contract; or third, transferring any ownership rights. In the absence of such a contract, the facts were everything.

There are many available lenses for inspecting the facts behind a joint authorship claim, and all support reversal here. Despite the district court faulting Moi for not identifying every brushstroke that he made, ER 19, the Copyright Act contemplates that joint authors will create a work with "inseparable" parts. 17 U.S.C. § 101. The touchstone is the contributors' "intention" to join their contributions into "a unitary whole." *Id.* Besides the statute's plain text, this Court's three-part *Aalmuhammed* framework counsels in favor of reversal. Moi demonstrated enough evidence of joint artistic control, expressive intent, and audience appeal to warrant a jury trial. Plus, *Aalmuhammed* cautions that its criteria are non-exclusive, and joint authorship "cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much." *Id.* at 1235.

The VARA is an amendment to the Copyright Act of 1976 that supplies visual artists with the "moral rights" of attribution and integrity. *Cheffins v. Stewart*, 825 F.3d 588, 592 (9th Cir. 2016). If this Court agrees that a genuine dispute of material

fact is presented for trial on Moi's joint authorship claim, his VARA claims should be remanded for trial as well.

The district court erred in refusing to allow discovery of Chihuly's confidential settlement agreements with ████████. By failing to make any finding of good cause under FRCP 26(c), the court's protective order cannot be sustained on the usual basis for foreclosing discovery of secretive information. In finding the agreements "inadmissible," the court applied the wrong legal standard, because FRCP 26(b)(1) expressly provides that information need not be admissible to be discoverable. The district court also appeared to buy Chihuly's argument that a special, higher standard of relevancy applies to discovery requests for confidential settlement agreements. That is not correct. Because the usual relevancy standard under FRCP 26(b)(1) applies, and because the confidentiality agreements were relevant to potential witness biases and to disprove Chihuly's claims against Moi of frivolity and bad faith, the district court erred in entering its protective order.

Chihuly's promise to take care of Moi financially was enough to create a jury question on Moi's promissory estoppel claim. Given background principles of copyright law and state law, Moi did not need to demonstrate that Chihuly had made a promise to pay a specific amount.

The district court erred in awarding attorney fees under 17 U.S.C. § 505 to Chihuly of $1.6 million. Moi's claims were not frivolous or objectively

unreasonable, because he sought out the opinions of two experts who confirmed the core features of his claim. An eyewitness, Piper O'Neill, also corroborated key facets of Moi's testimony and did not contradict any. While Chihuly may not have enjoyed having his health problems and his secrecy brought up in court, those issues have been aired publicly for years, and related facts were material to rebut Chihuly's claim of sole authorship and to prove Moi's claim of joint work. Fees should have never been awarded. And they at least should have been trimmed, because Chihuly did not carry his burden of segregating efforts on clerical tasks, unsuccessful theories, and unnecessary and duplicative work.

## F.    ARGUMENT

### (1)    Standard of Review on Summary Judgment

This Court reviews a district court grant of summary judgment *de novo*. *E.g.*, *Adair v. City of Kirkland*, 185 F.3d 1055, 1059 (9th Cir. 1999). Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "is relevant to an element of a claim or defense," and its "existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). A dispute about a material fact may be "genuine" even if the matter may not "be resolved conclusively in favor of the party asserting [the material fact's] existence." *Id.*

(quotation omitted). "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (quotation omitted).

On appeal, this Court does not "weigh conflicting evidence with respect to a disputed material fact," nor does this Court "make credibility determinations." *Id.* (citations omitted). Such an evaluation of the record is "within the province of the factfinder at trial"—here, the jury. *Id.* All reasonable inferences must be "drawn in the light most favorable to the nonmoving party . . . from underlying facts that are not in dispute, such as background or contextual facts, and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party." *Id.* at 631 (citations omitted). An uncontested expert opinion on a material fact creates a genuine dispute for trial. *See, e.g.*, *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 816 (9th Cir. 2019); *Smith v. Mitchell*, 453 F.3d 1203, 1208 (9th Cir. 2006).

### (2)    Whether Moi Had a Joint Authorship Claim Under the Copyright Act Was for the Jury

Under the Copyright Act, a "joint work" is a work "prepared by two or more authors with the intention that their contributions be merged into any inseparable or interdependent part of a unitary whole." 17 U.S.C. § 101. Joint authors co-own the copyright. 17 U.S.C. § 201(a). As co-owners, "each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account

to the other joint owner for any profits that are made." *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998) (citations omitted); *see also*, 17 U.S.C. § 106 (enumerating a copyright owner's rights). Moi does not challenge Chihuly's coownership rights; he claims only that he has been denied his co-ownership rights as a joint author of the paintings. The term "author" is undefined in the Copyright Act, but the district court ruled as a matter of law that Moi was not one. ER 15-18. The court erred, because authorship is a *question of fact. Del Madera Properties v. Rhodes & Gardner, Inc.,* 820 F.2d 973, 980 (9th Cir. 1987). This dispute should have been resolved by a jury, not a judge evaluating Moi's artistic contributions and his credibility.

### (a) The Copyright Act Provides Tools for People with Unique Ideas and Methods to Solely Own the Copyright in a Work They Do Not Make Alone, but Chihuly Utilized None of Them

For starters, Chihuly incorrectly believes that an artist's "style" and "vision" can alone establish sole copyright ownership. ER 1341, 1470. Because the paintings "embody his instructions and creativity," Chihuly's company says that Chihuly must be their sole author, no matter how much work he put into them. ER 1201. But "[t]o qualify as an author, one must supply more than mere direction or ideas." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994). Indeed, the Copyright Act protects only a *work*, not *ideas* or *methods*. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1985). The Act specifies that "[i]n no case

does copyright protection for an original work of authorship extend to any *idea*, *procedure*, or discovery, regardless of the form in which it is described, explained, *illustrated*, or *embodied* in such work." 17 U.S.C. § 102(b) (emphasis added). The Act also confirms that a work is "created" only when "it is *fixed in a copy* ... for the first time." 17 U.S.C. § 101 (emphasis added). Given these plain statutory terms, the Supreme Court recognizes that the author of a work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Thus, even if Chihuly were right that he originated the ideas and techniques, or that Moi was only following Chihuly's directions, those facts do not alone justify taking the authorship question from the jury.

The Copyright Act does not leave an "idea" person like Chihuly without recourse. But by comparing himself to Michelangelo and contemporaries such as Jeff Koons and Kehinde Wiley, ER 1247, 1335, 1342, 1561, Chihuly seems to argue that a common approach to artistic production would be decimated unless he were spared from a jury's judgment. But Chihuly never says whether those other artists have made appropriate arrangements with their collaborators under the Copyright Act. The Act provides at least three tools for people like Chihuly who want to employ assistants or pay contractors to help them create a work, or who have ideas and want to hire others to realize that vision into a work. First, such a person may

hire someone as an employee. Under the Act, employers own the copyright in works made by employees within the scope of their employment. *See* 17 U.S.C. § 201(b) (establishing who owns the copyright in a "work made for hire"); *id.* § 101 (defining "work made for hire"); *Reid*, 490 U.S. at 738 (construing these statutes). But Chihuly chose not to employ Moi (or Piper O'Neill). ER 1039-41, 1201, 1462. Second, for certain types of works, including a "collective work," a person may "specially order[] or commission[]" a contribution. 17 U.S.C. § 101. If the arrangement is set out in an express written agreement, the hiring party owns the copyright. *Id.*; 17 U.S.C. § 201(b). But Chihuly chose not to enter such a written agreement with Moi (again, or Piper O'Neill). ER 1059, 1063, 1097, 1467. Third, a person may contract for the transfer of ownership of a copyright. 17 U.S.C. § 201(d). But Chihuly forwent a contract with Moi to transfer any copyright claim he might have to Chihuly. ER 1059, 1063, 1097.

In sum, despite Chihuly's grandiose comparisons of himself to other artists, ER 1247, 1335, 1342, 1561, Congress wrote a specific legal blueprint for artists to follow if they want to own as a matter of law the copyright in works based on their ideas or produced under their direction. *See, e.g.*, *Armento v. Laser Image, Inc.*, 950 F. Supp. 719, 731, 733 (W.D.N.C. 1996), *aff'd*, 134 F.3d 362 (4th Cir. 1998) (concluding after a bench trial that the plaintiff-artist did not have copyright ownership because the he made the work for hire and contractually transferred any

copyright he might assert). But without one of these legal arrangements, as here, the question of authorship "must of necessity focus on the facts." *Aalmuhammed*, 202 F.3d at 1235.

> **(b)** **Whether Joint Contributors to a Work Are Joint "Authors" Under the Copyright Act Is a Fact-Intensive Jury Question with Flexible Guidelines, Not a Rigid Statutory Formula**

This Court has identified three guidelines that may be used to evaluate whether a claimant is a joint author under the Copyright Act. First, an author "superintends the work by exercising control." *Aalmuhammed*, 202 F.3d at 1234 (quotation and brackets omitted). This is the "most important" criterion. *Direct Techs., LLC v. Elec. Arts, Inc.,* 836 F.3d 1059, 1069 (9th Cir. 2016). Second, the "putative authors make objective manifestations of shared intent to be coauthors." *Aalmuhammed*, 202 F.3d at 1234. And third, "the audience appeal of the work turns on both contributions and 'the share of each in its success cannot be appraised.'" *Id.* (quoting *Edward B. Marks Music Corp. v. Jerry Vogel Music Co., Inc.,* 140 F.2d 266, 267 (2nd Cir. 1944), *modified by,* 140 F.2d 268 (1944)).[2]

---

[2] By contrast, the Seventh Circuit has identified only two factors, one of which is identical to one of the *Aalmuhammed* criteria, and one of which is distinct: "First, [the claimant] must show the parties intended to be joint authors at the time the work was created. Second, [the claimant] must show that its contributions to the works were independently copyrightable." *Erickson*, 13 F.3d at 1071. The Second Circuit uses the same two factors. *Thomson*, 147 F.3d at 200.

These *Aalmuhammed* factors are not exclusive. They are simply "*among* the criteria for joint authorship, in the absence of a contract." 202 F.3d at 1234 (emphasis added). Joint authorship "cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much." *Id.* at 1235. For example, while superintending a work's creation might be an important consideration, Congress's standard for a "joint work" may be satisfied even if one of the artists was the dominant author of the team's artwork and the other artist played a lesser role. *Childress*, 945 F.2d at 507–08. And given the statutory basis for a joint authorship claim, Congress's own words must be the ultimate measure of a joint authorship claim. Indeed, in at least one other case since *Aalmuhammed*, this Court looked to the *Aalmuhammed* factors only after determining that the statute's words did not "shed light" on the joint authorship question presented on the facts. *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968-69 (9th Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009). As this Court has made clear, then, the *Aalmuhammed* factors do not establish mandatory elements of a joint authorship claim.

The *Aalmuhammed* factors also cannot be a basis for a district court to usurp the jury's role. Judges have long recognized the wisdom of restraint when evaluating matters of art under the Copyright Act. As Justice Oliver Wendell Holmes observed, "It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the

23

narrowest and most obvious limits." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903). Indeed, this Court has not hesitated to reverse a district court that "constituted itself as the final judge of the worth of an expressive work." *Hall v. Swift*, 782 Fed. Appx. 639, 640 (9th Cir. 2019). Consistent with these principles of restraint, the various Circuits have reversed district courts that took the question of artistic authorship from the body that should decide—the jury. *E.g.*, *Direct Techs.*, 836 F.3d at 1069 ("We hold that there is a genuine issue of material fact as to whether DT was sufficiently in control of its artistic contribution to qualify as a joint author in the resulting USB drive prototype."); *Gaiman*, 360 F.3d at 644 (recognizing copyright interest by script writer in comic book characters). *See also, Fun Spot of Florida, Inc. v. Magical Midway of Cent. Florida, Ltd.*, 242 F. Supp. 2d 1183, 1202 (M.D. Fla. 2002) (concluding a jury question was presented on joint authorship claim). Under these bedrock principles of copyright law, the district court's choice to decide this case as a matter of law cannot be sustained.

    (c)    **The Jury, Not the District Court, Should Have Decided Whether Moi's Artistic Contributions Rose to the Level of Co-Authorship**

    (i)    **The Statutory Text—"Inseparable" Contributions**

To begin with, the district court erred in requiring Moi to produce unassailable evidence of specific, concrete contributions that he made to each work. Even though the court stated that it "does not doubt that, in some respects and as to some

paintings, plaintiff made original artistic contributions that were independently copyrightable," the court still thought it proper for a judge, instead of the jury, to decide Moi's joint authorship claim because "it is impossible to identify [Moi's contributions] on the current record." ER 19. But the district court disregarded the fluid and iterative creative process that unfolds when multiple artists collaborate on a work.

Congress, by contrast, was mindful of the indefinite nature of co-authorship when it crafted the standard for a "joint work." Congress even made it a *requirement* that co-authors' contributions "be *merged*" and be an "*inseparable* or *interdependent* part of a unitary whole." 17 U.S.C. § 101 (emphasis added). The statutory terms "inseparable" and "interdependent" "may be explained as follows":

> [I]f author B's contribution when combined with author A's contribution results in recasting, transforming or adapting A's contribution, then the two contributions may be said to be inseparable. If the process is simply one of assembling into a collective whole A's and B's respective contributions, without thereby recasting A's contribution, then the two contributions may be said to be interdependent.

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990) (quotation omitted). Thus, a claimant may validly assert co-authorship where the claimant's contributions were "inseparable" from the whole, as a jury may find Moi's were here. Because the Copyright Act itself understands joint authorship as involving inseparable contributions, the district court erred in requiring evidence of

25

Moi's specific, separate contributions. *Aalmuhammed* only confirms that co-authors need not identify their contributions with the specificity required by the district court. As this Court recognized, a "joint work" may be created even if "the share of each [artist] in [the work's] success cannot be appraised." 202 F.3d at 1234 (quotation omitted). That is to say, a jury may find Moi engaged in the very type of interactive artistic process that entitles artists to copyright co-ownership of the "undivided whole." *M.G.B.*, 903 F.2d at 1493.

In this context, the district court's refusal to even acknowledge the expert testimony was error. One such expert, Dr. Thompson, supported Moi's co-authorship claim because Moi made an "inseparable" contribution. Dr. Thompson opined, "Moi's contributions were of the nature in the artistic community are considered inseparable, symbiotic, and codependent parts of the artwork's creation that were combined into a single final product." ER 1564. This expert opinion alone created a genuine dispute for the jury to resolve. *See, e.g.*, *Ingenco*, 921 F.3d at 816; *Smith*, 453 F.3d at 1208. When the district court overlooked this expert opinion and castigated Moi for his inseparable contributions, the district court also supplanted the jury as arbiter of art, contrary to this Court's admonition in *Hall*, 782 Fed. Appx. at 640.

But, in any event, the district court overlooked the evidence from which a reasonable jury *could* identify Moi's specific contributions. When the record is

viewed in the light most favorable to Moi, as it must be, it shows that Moi painted backgrounds and made the burns on the *Burn* series paintings among the 285 works. ER 1045, 1083-84, 1098, 1462-63, 1465-67, 1578. Moi was not merely the implementer of Chihuly's artistic vision; he was an independent artist and part of a team. In 2014, Piper O'Neill observed her husband, Billy, and Moi creating the artwork together: "I just remember I went to the studio to drop food off for Billy, and they were painting. He and Michael were painting." ER 1466. While Chihuly offers a self-portrayal as a micro-manager who prescribed every brush stroke, ample evidence should have gone to a jury about Chihuly's absenteeism, which he admitted. ER 1199, 1248. Moi had time and space to work independently, and he testified that "the colors and the actual creation is different for each person." ER 1111.

### (ii)    The "Control" Factor

The *Aalmuhammed* guidelines confirm that the district court should have submitted this case to the jury. The court misapplied the "control" factor for many reasons. First, the district court should not have weighed Chihuly's evidence that he made the final decision about whether to sign and market the paintings. ER 16. After all, the Copyright Act protects unfinished works, not just final products. *Mass. Museum of Contemporary Art Found., Inc. v. Buchel*, 593 F.3d 38, 51 (1st Cir. 2010). Thus, before a work is even finished, an artist may be deemed the author of a

copyrightable work. It follows that authorship does not depend on what happens after a work is finished.

In any event, Chihuly's decision to withhold his signature or discard some works simply means that in *those* specific instances, Chihuly decided not to make a contribution to "be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. That is no different than any other artistic collaboration where a potential collaborator chooses not to contribute to a joint work. Consider a songwriting team comprising a lyricist and composer. When the duo chooses to merge their lyrics and musical composition together, they may become co-authors of a joint work—a unified song. *Edward B. Marks*, 140 F.2d at 267. But their co-authorship of that specific song cannot be negated by the mere fact that in other instances, the composer might not like the lyricist's words for a proposed song, choosing not to make any music to create a song, a joint work. So too here. Chihuly was free to not add his contributions to Moi's, just as Moi was free to decline to go to Chihuly's studio.

Second, the district court conflated supervision over a copyrightable work's utilization with supervision over a work's artistic creation. In other words, the court did not anchor its analysis in the process of creation. The control inquiry is meant to be contextual: control turns on who "'creates, or gives effect, to the idea, fancy, or imagination.'" *Aalmuhammed*, 202 F.2d at 1233 (quoting *Burrow-Giles*, 111 U.S. at

61). The term "create" does not refer to the creation of a concept, because the Copyright Act does not protect ideas. 17 U.S.C. § 102(b); *Harper & Row*, 471 U.S. at 547. While Chihuly may have come up with artistic ideas, the record shows— when viewed in the light most favorable to Moi—that Moi, not Chihuly, superintended his own work in giving effect to these ideas in the forms of burns, painted backgrounds, and painted shapes. After all, how could Chihuly have supervised these portions of the works' creation when he was often not even physically present? ER 1046, 1097-99, 1102-03, 1106, 1410, 1440-41. As Chihuly himself admitted, his tangible contributions were sometimes limited to solely signing a painting. ER 1470. And Chihuly does not even claim to have conceived of the *Burn* series. ER 1470. It makes no difference that Moi initially received instruction from Chihuly on how to make these artistic contributions, or that broad artistic concepts originated with Chihuly. Again, the Copyright Act protects only *tangible* expressions, not ideas and techniques. 17 U.S.C. § 102(b).

Third, Moi did not need to be the dominant creator. *See Childress*, 945 F.2d at 507–08; *see also*, 1 *Nimmer on Copyright* § 6.03 at 6-6 (2012 Update) (stating that joint authors' contributions do not need to be "equal in quantity or quality"). By equating Chihuly's process with sole authorship—and thus sole ownership of the copyright—the district court inadvertently condoned the conditions that senior artists might use to exploit or steal from junior artists who have less power and

renown. Consider Chihuly's arrangement here. He did not dispute that many people—who were not his employees or even paid as contractors under a "work for hire" arrangement provided in 17 U.S.C. § 201(b)—contributed to works that he then signed and marketed as his own. While his wife and personal friends claim that the art world knows that Chihuly relies on assistants for his paintings, not just his glass art, Moi adduced expert testimony to the contrary. ER 1491, 1560-61, 1569-70. In fact, Moi's testimony, which must be credited at this stage, was that Chihuly sometimes even had someone else sign for him. ER 1081, 1471.

Congress meant to protect artists from this type of exploitation when it crafted protection for joint works and coupled those protections with formal requirements for a "work for hire" arrangement. *See* 17 U.S.C. §§ 101, 201(b); *Dumas v. Gommerman*, 865 F.2d 1093, 1101 (9th Cir. 1989), *rejected on other grounds by Reid,* 490 U.S. at 739, 742 n.8 (recognizing that the statutory scheme serves to protect artists against those who have "the stronger bargaining position and access to legal advice"). As another federal court has recognized, the *Aalmuhammed* "control" factor should not be applied in a way that allows a dominant artist to profit from "wrongful conduct." *Berman v. Johnson*, 518 F. Supp. 2d 791, 797 (E.D. Va. 2007), *aff'd*, 315 Fed. Appx. 461 (4th Cir. 2009) (quotation omitted). Power can be abused, and so the control factor should be applied cautiously.

Fourth, the district court failed to realize that the opinions of Moi's experts created a genuine issue for trial. Both Dr. Thompson and Blades-Lines concluded that Moi was a joint author of the paintings that Moi had identified. ER 1563-64, 1570. But Chihuly did not object to the expert opinions of Dr. Thompson and Blades-Lines on evidentiary grounds. ER 469-85, 1239-69. Instead, Chihuly objected only that the experts had not changed their opinions after Moi's deposition was taken. ER 474. That is not a basis for ruling as a matter of law under Rule 56. Rather, it is a topic for cross examination in front of the jury, or for a defense expert to explain to the jury why Moi's deposition testimony should have led Dr. Thompson and Blades-Lines to change their minds. If anything, Chihuly's dispute with Moi's experts only underscores that this case was for a jury to resolve. *See, e.g.*, *Ingenco*, 921 F.3d at 816; *Smith*, 453 F.3d at 1208.

### (iii)   The "Intent" Factor

The next *Aalmuhammed* factor, intent, also did not support summary judgment. Whether Chihuly intended to own the works is not dispositive, because intent relates to artistic expression under the Copyright Act's definition of a "joint work." 17 U.S.C. § 101 ("intention that their contributions be merged into any inseparable … part of a unitary whole"). The Legislative history confirms this view: "The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit, although the parts themselves may

31

be either 'inseparable' (as the case of a novel *or painting*) or 'interdependent' (as in the case of a motion picture, opera, or the words and music of a song)." H.R. Rep. 94-1476, 120, 1976 U.S.C.C.A.N. 5659, 5736.

Through this lens, the record reveals a jury question on the parties' intent. Chihuly did not cite a single instance in which he claimed *sole* authorship. While Moi certainly acknowledges that the paintings belonged to Chihuly, that admission is consistent with joint authorship because joint authors are *co-owners* of the work. 17 U.S.C. § 201. A jury would also be entitled to consider the circumstances behind Chihuly's signatures and public marketing of the paintings as his own. Based on Chihuly's insistence on secrecy, a jury could infer that Chihuly was seeking merely to cultivate his reputation and maximize profits, not to disavow that his collaborators such as Moi were also authors of the works. Indeed, Chihuly had repeatedly told Moi that he would be "taken care of" and reassured Moi that Chihuly's company was keeping "a record." ER 1045, 1049, 1054-55. According to Dr. Thompson, "the communications between Moi and Chihuly were communications that were of a nature that—in the artistic community—would be considered a reasonable belief and agreement of joint authorship*, at a minimum*." ER 1564 (emphasis added).

As with the "control" factor, an undue emphasis on the parties' intent regarding ownership, as opposed to artistic expression, would undermine the Copyright Act's purpose. Of course, while the existence of multiple signatures on a

work might be a positive indicator of joint authorship, the absence of such signatures should not be dispositive in the negative. By unilaterally decreeing, "I am the sole author of this work," a senior artist could simply sign a junior artist's painting and sell it with no obligation to the junior artist. The district court's conception of intent would allow authorship to boil down to the existence of a signature. The touchstone of intent must be the artist's *expressive* intent, not their *ownership* intent.

### (iv)   The "Audience Appeal" Factor

Finally, under the third *Aalmuhammed* factor, the district court correctly understood a jury question was present. ER 18. This Court need look no further than Chihuly himself to see the audience appeal of Moi's contributions. For example, Chihuly has admitted that the burns were an "artistic expression." ER 1470-71. And Chihuly's self-published art book extolled the paintings' backgrounds and the forms which Moi sometimes painted. ER 1237. Moi's contributions can hardly be dismissed as irrelevant to the audience appeal of the *Burn* paintings.

In sum, the district court here intruded upon a jury's role in making the factual determination of authorship, despite substantial evidence Moi adduced to the contrary. Under a proper application of the Copyright Act's text and this Circuit's non-exclusive interpretive guidelines, the district court should have submitted this Moi's joint copyright claim to the jury.

### (d)    Moi's Claims Under the VARA Should Be Remanded for Trial

If this Court holds a jury question was presented on Moi's joint authorship claims, then Moi's claims under the VARA should be remanded for trial as well. Moi's complaint requested an accounting and injunctive relief under the VARA, which protects the rights of "an author of a work of visual art." 17 U.S.C. § 106A. ER 1320. Because VARA's protections turn on whether a claimant is an "author," Chihuly argued correctly below that Moi's VARA claims rise and fall with his joint authorship claims under the Copyright Act. ER 1264. Thus, if this Court determines that a jury must resolve Moi's copyright claims, then this Court should also reverse the dismissal of Moi's VARA claims.

### (3)    Moi's Copyright Claims Are Not Limited to Those Produced After February 21, 2014

Under the Copyright Act's statute of limitations, a claim for joint authorship must be brought within three years after the date of accrual. 17 U.S.C. § 507(b). A joint author's claim of co-ownership "accrue[s] when plain and express repudiation of co-ownership is communicated to the claimant." *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996), *cert. denied*, 519 U.S. 1090 (1997). Whether a putative joint author's claim to co-ownership has been plainly and expressly repudiated may not be resolved on summary judgment when the record shows "a genuine issue of material fact as to whether such repudiation occurred." *Everly v. Everly*, 958 F.3d

442, 456 (6th Cir. 2020). The district court held that Moi's claims were limited to those works produced after February 21, 2014. ER 21-22. In so ruling, the district court again erred by intruding upon the jury's function.

The district court correctly recognized that Chihuly's copyright registrations for the works did not constitute a sufficient repudiation of Moi's claim to co-ownership. ER 21-22. This Circuit requires an "express" repudiation. *Zuill*, 80 F.3d at 1369.[3] Nothing in *Zuill* or *Aalmuhammed*, 202 F.3d at 1230-31, which relied on *Zuill*, suggests that a "constructive" repudiation suffices. Were it otherwise, "[a]n unscrupulous claimant could surreptitiously register a copyright, hoping that the real author would not discover the registration for three years," as the district court realized. ER 21-22. Such gamesmanship would despoil the Copyright Act's core purpose "of enriching the general public through access to creative works." *Fogerty*, 510 U.S. 517, 527 (1994). This purpose is served by the *Zuill* standard, as this Circuit recognized, because a requirement of an express repudiation complies with the Supreme Court's teaching that "'the boundaries of copyright law be demarcated as clearly as possible.'" *Zuill*, 80 F.3d at 1370 (quoting *Fogerty*, 510 U.S. at 527).

Here, it was only in late 2016, after the conversation with Chihuly's associate Victor Humeniuk, that Moi realized that Chihuly repudiated his collaborators'

---

[3] The First Circuit has held that a copyright registration is "constructive notice" of a claim of exclusive ownership of a copyright. *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 66 (1st Cir. 1997).

ownership interest in the paintings. ER 1412. Chihuly had never before made "a direct statement from one party to another claiming exclusive rights to the work." *Everly*, 958 F.3d at 451. Until then, Chihuly had repeatedly told Moi that he would be "taken care of" and reassured Moi that Chihuly's company was keeping "a record." ER 1045, 1049, 1054-55. According to Dr. Thompson, "the communications between Moi and Chihuly were communications that were of a nature that—in the artistic community—would be considered a reasonable belief and agreement of joint authorship, at a minimum." ER 1564. This expert opinion, together with the underlying facts, establish a fact issue as to when Chihuly plainly and expressly repudiated any Moi's co-ownership.

While Chihuly signed and marketed the paintings, none of these facts are inconsistent with co-ownership. A co-owner of a copyright has *broad* rights, including the right to reproduce the work, to make derivative works, to display the work, and to sell it. 17 U.S.C. § 106. A plain and express repudiation of co-ownership cannot be synonymous with a co-owner simply acting within his or her rights under the Copyright Act. The collaborators' agreed secrecy also casts doubt on whether the public-facing presentation of the paintings was a repudiation of the confidential contributions of Chihuly's collaborators. This was a jury question.

**(4)** **Chihuly's Confidential Settlement Agreements with** ██████████ **Were Discoverable**

The district court erroneously entered its protective order barring Moi from discovering any information about the confidential settlement agreements between Chihuly and ████████████. ER 388.1. Generally, this Court reviews a protective order for an abuse of discretion. *Reza v. Pearce*, 806 F.3d 497, 508 (9th Cir. 2015). But *de novo* review applies to "whether the lower court used the correct legal standard in determining whether it should have granted a protective order." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002) (citation omitted). Here, the district court applied the wrong legal standard in finding the agreements were "inadmissible" and "irrelevant," and it also abused its discretion in its relevancy determination.

*Inadmissibility*. By Rule 26's terms, information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). To be discoverable, information needs only to be "nonprivileged," "relevant to any party's claim or defense," and "proportional." *Id.* But Chihuly did not assert a privilege, did not allege that Moi's deposition questions and document requests were disproportional, and did not argue they would be inadmissible if offered at trial. Dkt. #84 at 4-7. Rather, he argued only that the settlement agreements were irrelevant. *Id.* The district court fashioned its own rationale with its inadmissibility determination, in conflict with Rule 26(b)(1). It applied the wrong standard.

*Relevance.* Although the district court's standard for determining relevancy was not expressly stated in its order, ER 388.1, the court likely agree with Chihuly's argument that Moi needed to make a "'particularized'" and "'heightened showing that the settlement information sought is relevant,'" given the "'public policy favoring settlement of disputed claims.'" Dkt. #84 at 5 (quoting various unreported district court orders). That is not the correct standard for relevancy. The Ninth Circuit has not decided the issue, but many district courts have held that the general rules of discovery apply to confidential settlements, not special a special standard. *See, e.g.*, *Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*, 2015 WL 164069 at *8 (D. Conn. Jan. 13, 2015) (holding that "no heightened showing of relevance need be made" for discovery of confidential settlement communications (quotation omitted)); *In re Enron Corp. Secs., Derivative & Erisa Litig.*, 623 F. Supp. 2d 798, 838 (S.D. Tex. 2009) (recognizing that Rule 26's liberal relevancy standard applies to confidential settlement agreements).

While Chihuly did find some authorities to support his view, they are unpersuasive, for four reasons. First, the 2015 amendments to Rule 26's scope of discovery "do not alter the basic tenet that Rule 26 is to be liberally construed to permit broad discovery." *State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*, 315 F.R.D. 220, 222 (E.D. Mich. 2016). Creating a special

relevancy test for confidential agreements would open the door to extra-textual efforts to narrow the Rule's scope of discovery. Second, the party *resisting* discovery bears the burden of showing that the requested information is irrelevant. *E.g.*, *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975); *United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 411 (D. Md. 2005); *but see, e.g.*, *Morrison v. Philadelphia Hous. Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001). Chihuly's special test would flip the burden. Third, if private parties could use confidentiality agreements to get around discovery's truth-finding function, "disturbing consequences" would result, including "the practice of buying the silence of a witness with a settlement agreement." *Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993) (quotation and brackets omitted). Fourth, even in the Sixth Circuit, which holds that settlement *negotiations* are privileged from discovery, final settlement *agreements* enjoy no such protection. *E.g.*, *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 981 (6th Cir. 2003). Confidential settlement agreements should not be given quasi-privilege, and there is no Court of Appeals precedent for it of which Moi is aware.

Even Federal Rule of Evidence 408, the procedural rule which most clearly embodies the policy favoring settlements, has "limited applicability." *Rhoades v. Avon Products, Inc.,* 504 F.3d 1151, 1162 (9th Cir. 2007). FRE 408 applies to

evidence of settlement agreements if offered "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent purpose." Fed. R. Evid. 408(a). But the rule speaks only of evidence's admissibility. It thus has no bearing on discovery, as opposed to evidence offered at trial or with a motion. *Big Baboon Corp. v. Dell, Inc.*, 2010 WL 3955831 at *2 (C.D. Cal. Oct. 8, 2010) (cited by Chihuly below). And by its own terms, FRE 408 *does* allow evidence of settlement to be admitted "for another purpose, *such as proving a witness's bias or prejudice*"—the very purpose for which Moi sought to information about the settlement agreements. Fed. R. Evid. 408(b) (emphasis added). Given this exception, "[w]hen statements made during settlement are introduced for a purpose unrelated to liability, the policy underlying the Rule is not injured." *Rhoades*, 504 F.3d at 1161-62. Chihuly simply makes too much of the policy favoring settlements.

If confidentiality ever needs protecting, FRCP 26(c) accounts for that need. As with trade secrets or any other sensitive matter, a party with a confidential settlement agreement may show "good cause" for protection "from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). But Chihuly did not cite that provision. Dkt. #84 at 4-7. Without evidence, he claimed that "[t]hese documents contain sensitive internal business information the disclosure of which could cause harm to Chihuly and increase the likelihood of

having to engage in frivolous litigation." *Id.* at 6. But "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 476 (9th Cir.1992) (quotation omitted). Chihuly's naked assertion suggests that Chihuly was arguing irrelevancy only as an end run around FRCP 26(c). In any event, the district court did not make any findings about good cause, ER 388.1, despite this Court's requirement that a district court's protective order be supported by specific findings "to allow appellate review of the exercise of its discretion." *Phillips v. Gen. Motors*, 307 F.3d 1206, 1212 (9th Cir. 2002). The district court erred.

The district court's ruling should be reversed because it "results in actual and substantial prejudice to the complaining litigant." *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (quotation omitted). The only reasonable conclusion is that the information was relevant for discovery purpose. Settlement agreements are relevant to explore a witness's bias or prejudice, both at the discovery stage and at trial. *See, e.g.*, *Enron*, 623 F. Supp. 2d at 836-37 (discovery); Fed. R. Evid. 408 (trial). Moi should have been permitted to discover the settlement agreements to determine whether ███████████████████████ had agreed to confidentiality, non-disparagement, or cooperation clauses that might explain any slant to their testimony at trial or their unwillingness to meet with Moi to determine which paintings were

41

ones Moi jointly created. Moi also should have been permitted to determine whether he has been kept from seeing evidence that would rebut Chihuly's argument that Moi's claims are frivolous and in bad faith. *See, e.g.*, *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000) (recognizing that a settlement agreement may be relevant to show a party's good faith). In short, under the broad relevancy standard in Rule 26(b)(1), the settlement agreements were relevant for purposes of discovery.

### (5)   Chihuly Was Estopped to Deny His Agreement with Moi

The district court dismissed Moi's promissory estoppel claim because Chihuly's assurances to Moi were "simply too vague to be enforceable." ER 20. The district court erred.

Under a Washington law, there are five elements of a promissory estoppel claim:

> (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only be enforcement of the promise.

*Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wash.2d 255, 259 n.2, 616 P.2d 644, 646 (1980) (quotation omitted). Here, when the record and reasonable inferences are viewed in the light most favorable to Moi, they show that Chihuly had a scheme of inducing contributors to help him produce thousands of paintings, at no cost to Chihuly. Chihuly said to Moi, "Michael, I will take care of you in the future."

ER 1048. Chihuly made this promise to Moi from the beginning, and Chihuly had made clear that "take care of" meant "financially." ER 1045, 1050-52, 1054-55. Moi had in return pledged to "keep painting and helping and I would get paid later." ER 1056. Chihuly had done the same with Piper O'Neill. She testified, "I had an understanding with Dale." ER 1467. What was that understanding? She said, "that I'd *be taken care of.*" ER 1467 (emphasis added). As with Moi, Chihuly expressed to Piper O'Neill that he wanted her "to keep coming to the paint sessions, and he said he'd take care of me." ER 1467.

Below, however, Chihuly argued—and the district court seemed to agree— that Chihuly's promise was not enforceable because he and Moi did not agree on "the exact amount," as Moi acknowledged. ER 20-21, 1056. While it is true that "[p]romissory estoppel requires the existence of a promise that is clear and definite," *Havens v. C & D Plastics, Inc.*, 124 Wash. 2d 158, 172, 876 P.2d 435 (1994), the district court's conclusion disregarded a core feature of copyright law. Copyright law recognizes that artists are "disadvantaged by the impossibility of determining their work's full value *until it has been exploited.*" *Dumas*, 865 F.2d at 1101 (citing H.R. Rep. No. 94–1476 at 124, U.S. Code Cong. & Admin. News 1976, p. 5739). Thus, Chihuly could not necessarily promise—and Moi could not necessarily

establish—the compensation to be paid. This application of copyright law dovetails with Washington law. Under state contract law, "[i]t is not necessarily fatal to the formation of a contract that the parties did not agree on the exact amount to be paid by the purchaser." *Howard v. Fitzgerald*, 58 Wash. 2d 403, 405, 363 P.2d 386, 388 (1961). And under Washington equitable principles, a remedy may be available in "a reasonable amount for work done, regardless of the existence of a contract." *Heaton v. Imus*, 93 Wash. 2d 249, 252, 608 P.2d 631 (1980).

A jury question is not foreclosed by *Lectus, Inc. v. Rainier National Bank*, 97 Wash. 2d 584, 590, 647 P.2d 1001 (1982), a case cited by the district court. ER 21. The issue in *Lectus* was not whether a genuine issue of material fact was presented for a jury trial. *See id.* The court believed that it was "highly unlikely" that the plaintiff could prevail before a jury, but the court did not hold that *no* reasonable jury could find for the plaintiff. *Id.* In any event, the court's doubts about the promise there did not turn on the lack of specificity. Rather, the court was dubious because the defendant's assurance was "merely a future conditional promise." *Id.* Here, the district court did not conclude that Chihuly's assurances were such a promise. ER 20-21. *Lectus* is not dispositive.

The district court also misrelied on *Aguilar v. Intl Longshoremen's Union Local No. 10*, 966 F.2d 443 (9th Cir. 1992). ER 21. In *Aguilar*, longshoremen argued

that they had been promised that one of the criteria for registering job applicants for longshore work would be their prior longshoring experience. 966 F.2d at 445. But the labor committee that made the disputed promise had stated in a letter only that one criterion would be "[a]ny training, education, and/or job experience you possess that will benefit the industry." *Id.* at 446. It did not specifically mention longshoring experience. Given the letter's broad language, this Court concluded that it was not specific enough to be construed as binding the labor committee to prioritizing prior longshoring experience above all other relevant experience. *Id.* at 446-47.

Here, by contrast, Chihuly's promise could have no other meaning than a promise to compensate Moi financially. Chihuly had not only told Moi that Moi would be "take care of *financially*," ER 1054 (emphasis added), but also Chihuly assured Moi that his company's "accounting has a record of all this, and you will be noted in it so that … you'll be taken care of and paid for what you've done," ER 1049. Unlike in *Aguilar*, where the promise's words had to be stretched to connote what the plaintiffs claimed, Chihuly's meaning was obvious: I will pay you money.

If Chihuly were right that he never made a binding promise to pay Moi, Piper O'Neill, and the others, he must be tacitly admitting that he never agreed to pay them and he was free to profit from their contributions in exchange for nothing. The absurdity of that view—that the law can do nothing about Chihuly exploiting other

artists—shows why Chihuly's assurances should be construed as potentially binding, if a jury so finds at trial. Promissory estoppel is an equitable remedy under Washington law. When Washington courts sit in equity, the ultimate objective is to justice. *Hough v. Stockbridge*, 150 Wash. 2d 234, 236, 76 P.3d 216 (2003). The inequity of Chihuly's position counsels strongly in favor of construing Chihuly's promises as enforceable, when viewed in the light most favorable to Moi. The alternative is for the courts to condone him profiting—to the tune of millions of dollars—without paying a penny to the artists whose contributions were so substantial that Chihuly often signed their works without even being present during their creation.

In short, the district court erred in taking Moi's promissory estoppel claim from the jury.

### (6)    <u>The District Court Abused Its Discretion in Imposing a Fee Award in Excess of $1.6 Million Against Moi</u>

The Copyright Act provides that a district court "may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. An award of fees under § 505 is discretionary, not mandatory. *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 533-34 (1994). The district court awarded $1.6 million in fees in a case resolved on summary judgment. ER 2-7. The district court erred here both in awarding fees to Chihuly and in fixing their amount.

46

### (a)    The District Court Should Not Have Awarded Fees

When exercising discretion under § 505, a district court should weigh several considerations. These considerations include "the degree of success obtained; frivolousness; motivation; objective unreasonableness (both in the factual and legal arguments in the case); and the need in particular circumstances to advance considerations of compensation and deterrence." *Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir. 1994). Additional considerations are "the degree of success obtained, the purposes of the Copyright Act, and whether the chilling effect of attorney's fees may be too great or impose an inequitable burden on an impecunious plaintiff." *Ets–Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003). While a district court's balancing of these equitable considerations is generally reviewed for an abuse of discretion, "any elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable *de novo*." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 665 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 504 (2017) (quotation omitted).

The district court concluded that Moi's suit was "frivolous" and "objectively unreasonable." ER 4-5. Because the $1.6 million award thus depended on the court's view of the legal sufficiency of Moi's claims, the court's legal analysis underpinned its award. Thus, this Court should review this basis for the fee award *de novo*.

Moi's joint authorship claim was not frivolous or objectively unreasonable. He consulted with well-credentialed experts who determined that he was the joint author of the identified works. ER 1563-64, 1570. Moi produced the deposition testimony of an eyewitness, Piper O'Neill, who corroborated many points in Moi's own testimony. She corroborated that (1) Chihuly had wanted to keep secret the other contributors' work on the paintings; (2) Moi did extensive burning of the *Burn* series paintings; (3) she saw Moi painting with Billy O'Neill in 2014; (4) she knew Moi painted backgrounds on some works; (5) Chihuly signed some works without having worked on them; and (6) and Chihuly told her too that he would "take care of" her. ER 1462-63, 1465, 1467. Piper O'Neill also she had no basis to disagree with Moi's claim that he co-created many paintings. ER 1465. This testimony of experts and a corroborating eyewitness showed that Moi's position was well grounded in fact. While reasonable minds might disagree on whether a jury question was presented, his copyright claim was not frivolous or objectively unreasonable.

Chihuly also argued—and the district court agreed—that Moi's suit was in bad faith because he sought to embarrass Chihuly and harm his reputation. ER 5, 178-79. It is true that Moi, in his demand letter and his complaint, mentioned Chihuly's health issues and Chihuly's secrecy about his reliance on other painters. ER 1305-24, 1442-56. But in discussing questions about Chihuly's health and secrecy, Moi did not surface any questions that have not been already reported and

discussed publicly.[4] And Chihuly's health problems were material: they helped prove that, as Piper O'Neill and Moi both testified, he often did not even have the capacity to participate in the creative process. ER 1410, 1464. In fact, Chihuly himself brought up his health in his summary judgment motion. ER 1248.

Moi's evidence of Chihuly's secrecy rebutted Chihuly's claim that Chihuly had intended to be a sole author and had repudiated any co-ownership with Moi. Chihuly's *omertà*, corroborated by Piper O'Neill, showed that Chihuly may have said one thing publicly but privately had a different attitude about other creators'

---

[4] ER 1293 (citing Regina Hackett, *Chihuly Victimized by His Own Success? Despite Depression, Legal Woes, Renowned Artist Still Turns Out the Work*, Seattle *Post Intelligencer* (Apr. 16, 2006), https://www.seattlepi.com/ae/article/Chihuly-victimized-by-his-own-success-1201229.php (last accessed June 27, 2020) ("Starting in his 40s, Chihuly has suffered from bipolar disorder."); *see also*, *e.g.*, Kathaleen Roberts, *The Glass Master Returns to Santa Fe*, Albuquerque *Journal* (Sep. 21, 2013), https://www.abqjournal.com/267112/glass-master-returns-to-sf.html ("He still churns out the work despite legal woes … and health problems, including bipolar disorder and periods of depression."); Sheila Farr & Susan Kelleher, *Inside the Glass Empire*, Seattle *Times* (Apr. 29, 2010), https://special.seattletimes.com/o/html/chihulyinc/2003178395_chihuly06.html (last accessed June 28, 2020) ("Yet some have expressed doubts that Chihuly could possibly sign the huge amount of work that comes out of the studio — especially given his busy travel schedule and health problems."); Timothy Egan, *Glass Artists Face Off in Court*, New York *Times* (June 1, 2006), https://www.nytimes.com/2006/06/01/us/glass-artists-face-off-in-court.html (last accessed June 28, 2020) ("The suit … offers a sometimes unflattering glimpse at how high-powered commercial artists like Mr. Chihuly work."); Jen Graves, *Glass Houses*, *The Stranger* (Feb. 16, 2006), https://www.thestranger.com/seattle/glass-houses/Content?oid=30734 ("His corporation mass produces art, putting out enough glass, prints, and ketchup-bottle-squirt paintings to raise questions about whether a single person could even keep track of—let alone design, direct, assemble, and sign—each expensive, supposedly personal piece.").

contributions. That is to say, Chihuly's culture of silence—and the representations to the art market that it served—was also highly relevant to the credibility of Chihuly as a witness and of his entire legal defense. A jury could and should weigh whether Chihuly had a motive to lie about Moi's contributions because Chihuly could face legal liability not only to Moi, but also potentially to gallerists and consumers if Moi's claims were found true. So, when Moi presented his experts' views of Chihuly's misrepresentations and the potential legal exposure to him if Moi's claims were vindicated, ER 1564, 1568-70, it was not a "shakedown." Instead, those opinions showed that Chihuly had a motive to lie. A witness's "self-interest" is relevant to bias, and "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984).

Because Moi's claims were not only objectively reasonable, but also for a jury to decide, the district court's award of attorney fees rested on a flawed legal analysis. The other considerations weighed by the district court in Chihuly's favor—deterrence value of a $1.6 million fee award and the potential chilling effect of such a sum—rested on the court's mistaken belief that Moi's claims were frivolous. ER 5. There remained no sufficiently tenable basis to award such a staggering amount of attorney fees to Chihuly.

### (b) The Fee Award Was Excessive in a Case Resolved on Summary Judgment

The lodestar method of calculating a reasonable attorney award controls here. *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 763 (9th Cir. 2015). The lodestar method generally involves the multiplication of the number of hours expended by counsel by the reasonable hourly rate. *Carter v. Caleb Brett, LLC*, 757 F.3d 866, 868 (9th Cir. 2014). A district court might have discretion to depart from the lodestar under § 505 of the Copyright Act, *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 669 F.3d 59, 63 (1st Cir. 2012), but the district court must give a "plausible reason for eschewing the lodestar method," *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 342 (1st Cir. 1997). Chihuly bears the burden of proving the reasonableness of his fee request. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 707, 711 (3d Cir. 2005).

In calculating the *reasonable* hours expended, a court must exclude time that is not associated with achieving a successful result for the client in the litigation, and time that is "excessive, redundant, or otherwise unnecessary." *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009) (quotation omitted). Unsuccessful activities in connection with an otherwise successful theory of record should be

excluded. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *see also, IFO*, 426 F.3d at 711-14. The overall reasonableness of the party's fee request can be assessed against the twelve factors set forth in *Kerr v. Screen Actors Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1976), *cert. denied,* 425 U.S. 951 (1976).

Chihuly's fee request suffers from a glaring defect:  despite multiple attorneys litigating multiple theories of recovery, only one of which was the basis for recovery, and activities that were unsuccessful, the district court did not sufficiently excise unnecessary time, ER 5-7, even though much of the time Chihuly spent was on *theories of liability on which Chihuly did not prevail against Moi.* The *only* theory on which Chihuly could be said to have "prevailed" was the Act.

The hours requested by Chihuly's attorneys were also duplicative or wasteful. The sheer number of attorneys billing makes the fee request unreasonable. Chihuly's law firm had 12 *different people* billing a total of 3,557.3 hours. ER 242. Each had to become acquainted with the case—*per se* needlessly duplicative time—and Chihuly has failed to explain the need for so many lawyers to be involved here. The sheer difficulty of coordinating such activities is an administrative nightmare (the word "coordinate" appears over 90 times on billing entries, ER 194-240) that should not be inflicted on Moi in a fee award. Chihuly seemingly believes that he did not

have to segregate duplicative or wasteful time because of his overall success in the litigation, but he bore the burden of doing so rather than imposing the burden on the courts. *Hensley*, 461 U.S. at 434. Because it was Chihuly's burden, the district court incorrectly faulted Moi for not objecting line by line. ER 7.

A considerable portion of Chihuly's fee request, 567.6 hours, is for paralegal time. ER 232. Clerical time is not a compensable time component for lawyers or their staff on a fee request. *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989). But Chihuly did not show that all this extensive paralegal work was legal in nature. *See, e.g.*, ER 93 (paralegal block bill for 11.8 hours on a single day, including for time to "coordinate logistics and drop off devices to vendor for imaging"); *id.* ("set up share drive for documents"). A party is not entitled to have their attorneys shift office overhead to a non-prevailing party.

In sum, Chihuly requested an award for excessive hours.

## G.  CONCLUSION

The district court erred in granting summary judgment to Chihuly and making an award of excessive fees to him. The court's judgment should be reversed, and the case remanded for a jury trial.

DATED this 30th day of June, 2020.

Respectfully submitted,

/s/ Gary W. Manca
Gary W. Manca, WSBA #42798
Philip A. Talmadge, WSBA #6973
Talmadge/Fitzpatrick
2775 Harbor Avenue SW
Third Floor, Suite C
Seattle, WA  98126
(206) 574-6661

Lincoln C. Beauregard, WSBA #32878
Evan T. Fuller, WSBA #48024
Connelly Law Offices, PLLC
2301 North 30th Street
Tacoma, WA  98403
(253) 593-0380

Attorneys for Appellant
Michael Moi

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume of limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,963 words as counted by Microsoft Word 2016, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 36(a)(6) because it has been prepared in a proportionally spaced serif typeface using Microsoft Word 2016 in 14-point Times New Roman.

DATED this 30th day of June, 2020.

/s/ Gary W. Manca
Gary W. Manca, WSBA #42798
Philip A. Talmadge, WSBA #6973
Talmadge/Fitzpatrick
2775 Harbor Avenue SW
Third Floor, Suite C
Seattle, WA  98126
(206) 574-6661

Lincoln C. Beauregard, WSBA #32878
Evan T. Fuller, WSBA #48024
Connelly Law Offices, PLLC
2301 North 30th Street
Tacoma, WA  98403
(253) 593-0380

Attorneys for Appellant
Michael Moi

## STATEMENT OF RELATED CASES

I, Philip A. Talmadge, certify that per Circuit Rule 28-2.6, that there are no known related cases pending in this Court.

DATED this 30th day of June, 2020.

/s/ Gary W. Manca
Gary W. Manca, WSBA #42798
Talmadge/Fitzpatrick

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** 19-35852

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

William C. Rava, WRava@perkinscoie.com; Susan E. Foster, SFoster@perkinscoie.com; Harry Schneider, HSchneider@perkinscoie.com; Roxann Ditlevson, RDitlevson@perkinscoie.com; Ian D. Rogers, IRogers@perkinscoie.com, Perkins Coie LLP, 1201 Third Avenue, Suite 4900, Seattle WA 98101

**Description of Document(s)** *(required for all documents)***:**

1. Appellant's Moi's Rule 27-13(e) Motion to File Brief of Appellant and Excerpts of Record Vol. 8 Under Seal Pending the Deposition of this Appeal;
2. Appellant's Opening Brief [Filed Under Seal]; and
3. Excerpts of Record, Volume 8 [Filed Under Seal].

**Signature** /s/ Gary Manca                **Date** June 30, 2020
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                              *Rev. 12/01/18*